**MT. CARMEL MERCY HOSPITAL,**
**Plaintiff,**
**v.**

**Margaret M. HECKLER, et**
**al., Defendants.**

**Civ. No. 82–74193.**

United States District Court,
E.D. Michigan, S.D.

Nov. 30, 1983.

Robert A. Klein, Los Angeles, William G. Christopher, Detroit, Mich., for plaintiff.

Jeanne Schulte Scott, Dept. of Health & Human Services, Washington, D.C., L. Michael Wicks, Asst. U.S. Atty., Detroit, Mich., for defendants.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

Plaintiff, Mt. Carmel Mercy Hospital, a provider of Medicare services, filed this complaint to challenge the validity of the new malpractice rule. Under the new rule, reimbursement for malpractice insurance costs is based on the "dollar ratio of the provider's Medicare paid malpractice losses for the [cost reporting period at issue] and the preceding 4-year period." 42 C.F.R. § 405.452(b)(1)(ii). Prior to the enactment of this rule, plaintiff was reimbursed for its malpractice insurance costs based on its Medicare utilization rate of approximately 36.2%. After the passage of the new rule, the Secretary only reimbursed plaintiff for 8.1% of its insurance costs. The parties have filed cross motions for summary judgment. After a careful examination of the able briefs filed by the parties and argument, we conclude that the new malpractice rule is invalid because it is arbitrary, capricious and in excess of the Secretary's statutory authority. We do find, however, that the Secretary did comply with the notice and comment procedures of the Administrative Procedure Act.

On October 28, 1981, Blue Cross/Blue Shield, plaintiff's intermediary, applied the

malpractice regulations that are being challenged in this cause, and the result was a substantial shortfall in plaintiff's expected reimbursement for medical malpractice insurance. Plaintiff challenged the intermediary's application of this rule before the Provider Reimbursement Review Board (PRRB). Plaintiff does not question the computations of the intermediary, rather it contends that the malpractice rule is legally invalid. Based on a 1980 amendment which provided for a bypassing of PRRB review and direct judicial review, the PRRB determined that expedited judicial review was proper. 42 U.S.C. § 1395oo(f)(1). Plaintiff then brought the matter before this court by filing a timely complaint.

In the early 1970's, the Secretary became concerned that she was paying a disproportionate amount of malpractice costs. The Secretary believed that Medicare patients as a class received smaller malpractice awards than non-Medicare patients. For example, if 32% of a hospital's patients were Medicare patients, it was likely that only 8% of its actual malpractice losses would be attributable to these patients. Based on this concern, the Secretary requested that a study be conducted by Westat. In chapter five of that study, Westat concluded, with obvious reservations about its statistical pool, that the total and average awards to Medicare patients in relation to other patients were disproportionately low.

After the Westat study was submitted to the Secretary, she issued a notice of proposed rule-making with regard to this new malpractice rule allowing 45 days for public comment. 44 Fed.Reg. 15744. Fifteen more days for public comment were then granted. 44 Fed.Reg. 25476. The final rule was then published on June 1, 1979. 44 Fed.Reg. 31641. The new regulation abandoned the traditional utilization method only with regard to malpractice costs. The Secretary did not attempt to directly apportion other general and administrative costs. Prior to this regulation, the general practice of the government was to group together all overhead costs of a hospital, and then to pay a percentage of the costs using the utilization of the hospital facilities by Medicare patients as the standard for reimbursement. Medicare, in the past, had paid slightly more for nursing care and for intensive care units, since Medicare patients disproportionately benefited by these services. The challenged regulation basically ignores the cost of insurance, and instead refers to the actual malpractice loss experience of Medicare patients in determining a hospital's reimbursement for malpractice expenditures.

We focus our analysis on whether the malpractice regulation is in derogation of the statutory power bestowed on the Secretary by the relevant statutes. The burden is on the party challenging the agency action to establish that the agency action was arbitrary, capricious, an abuse of discretion, in excess of statutory authority or not in compliance with necessary procedures.[1] 5 U.S.C. § 706(2)(A) and (C). In order to uphold the regulation, we must first find that the Secretary acted within her statutory power; that the actual choice made even if within her statutory power was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;" and last, the Secretary complied with the necessary procedural requirements. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416–417, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971). We will first examine whether the Secretary acted within her statutory authority.

When reviewing the issue of statutory compliance our scope of inquiry is narrow; basically we need to determine whether the Secretary's decision can reasonably be interpreted to be within her statutory authority. *Citizens to Preserve Overton Park, id.,* 401 U.S. at 416, 91 S.Ct. at 823. Several courts, when dealing with the Medicare Act, have more narrowly interpreted the Secretary's usual broad discretion in determining her own policy, be-

---

**1.** There are other grounds for finding an agency's action unlawful, but these are the grounds that plaintiff is relying on in this present cause of action.

cause of the more detailed statutory framework. *Northwest Hospital v. Hospital Service Corp.*, 687 F.2d 985, 988–989 (7th Cir.1982); *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir.1980); *St. John's Hickey Memorial Hospital v. Califano*, 599 F.2d 803, 813 (7th Cir.1979).

■ The Seventh and Ninth Circuits have limited the Secretary's discretion in this area because of the following language:

> The reasonable cost of any services shall be the cost actually incurred, *excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services,* and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types of classes of institutions, agencies, and services; .... In prescribing the regulations referred to in the preceding sentence, *the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations* (which have developed such principles) *in computing the amount of payment,* to be made by persons other than recipients of services, to providers of services on account of services furnished to such recipients by such providers.... *Such regulations shall (i) take into account both direct and indirect costs of providers of services* (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) *in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.*

42 U.S.C. § 1395x(v)(1)(A) (emphasis added to highlight the various portions of the statute that are relied on by each party). We find that the Secretary's actions with regard to the malpractice rule are outside of her statutory authority. The Secretary argues that Medicare was never designed to function as a competitive purchaser of health care services on the same economic terms as commercial third-party insurance companies. Medicare is, therefore, able to adopt different means of reimbursement as long as they result in the efficient delivery of medical services to its beneficiaries. The Secretary has cited a recent Supreme Court decision in support of her broad power to determine what a reasonable cost is and what is necessary in the efficient rendering of service. *Schweiker v. Gray Panthers,* 453 U.S. 34, 43–45, 101 S.Ct. 2633, 2639–2641, 69 L.Ed.2d 460 (1981). In *Gray Panthers,* the Court was dealing with a Medicaid provision that took into account a spouse's income when determining the funds available to an institutionalized spouse. The Court noted that as a result of the complex nature of the Social Security Act, Congress had bestowed broad power upon the Secretary in prescribing standards for certain sections of the Act. *Id.* at 43, 101 S.Ct. at 2639. The Court then went on to observe that Congress had explicitly delegated substantive power to the Secretary to determine what resources were available to the applicant. *Id.* at 43–44, 101 S.Ct. at 2640. In addition, there was Congressional language to support the conclusion that Congress had intended for the Secretary to consider the spouse's funds as available to the applicant. *Id.* at 44–45, 101 S.Ct. at 2640. Our facts are quite different from those in *Gray Panthers.* First, we are dealing with a much more circumscribed statute. The Secretary in determining reasonable costs must consider direct and indirect costs of rendering service, and must assure that non-Medicare patients are not bearing costs attributable to Medicare patients. In addition, the Secretary must consider costs that are deemed

necessary by other relevant national organizations. It is true that Congress has not explicitly delineated what constitutes a reasonable cost, but it has limited the Secretary's discretion in this area.

The Secretary then contends that this singling out of malpractice insurance costs is completely within her power to determine that a cost is not necessary or that she may develop a different method for reimbursing malpractice costs. Despite noting the uniqueness of this regulation in its preamble, the Secretary now argues that this is not a unique exercise of her power, even though it differs from the established policy of aggregating all general and administrative costs ("g and a"). The PRRB has consistently denied providers the chance to discrete cost various of their "g and a" costs. The Secretary is now arguing that this regulation is not a unique exercise of her power, because she has in the past singled out nursing care costs and intensive care unit costs. We are not persuaded by these examples. First, the additional reimbursement for nursing care (which is ending after 1982—42 C.F.R. § 405.430) is an exception to the "bed and board" services rendered directly to patients during hospitalization. These routine costs are different from malpractice costs, because there is nothing to balance the additional nursing care costs. Malpractice costs, unlike nursing care costs, are part of an aggregate pool of general and administrative costs, where many of the costs offset other costs. With nursing care, all the other "bed and board" costs of non-Medicare and Medicare patients were comparable, and thus there was nothing to balance. The Secretary's internal memorandums indicate that there are other "g and a" costs that balance the disproportionate payment for malpractice insurance under the present utilization system. Thus, the nursing care analogy is not persuasive, because it is not an example of the Secretary discrete costing a particular unit of "g and a" costs.

With regard to the singling out of intensive care units, plaintiff argues that intensive care units utilize the same accounting system, but that the Secretary reimburses these costs as a separate department, because of the disproportionate use by Medicare patients. Plaintiff contends that there is no logical reason to separate malpractice insurance from other insurance and other "g and a" costs. This contention is persuasive because there is no general study of the "g and a" costs of a hospital that would support the conclusion that the inclusion of malpractice insurance in "g and a" costs is causing a skewed result. The Secretary's two examples of where she has utilized discrete costing do not justify the malpractice rule. The main reason these examples fail is that they are not components of "g and a" costs, and thus there is not the traditionally recognized balancing. In addition, with malpractice insurance, we, at least traditionally, have not been dealing with a direct patient cost and thus it is not as easy to determine a disproportionate impact.

Because this is apparently the first time that the Secretary has singled out a particular "g and a" cost, we must view the malpractice rule as a unique exercise of her statutory power to determine reasonable costs. Despite our limited scope of review, it is difficult to find the malpractice regulation in compliance with the Secretary's statutory authority under the Medicare Act. As was already noted, there are limits to the Secretary's power in this area. The Secretary must consider direct and indirect costs. It is inconceivable how the Secretary can suddenly determine that malpractice costs are direct costs, and as a result ignore the significant indirect aspect of malpractice insurance. The Secretary is ignoring the fact that insurance premiums are paid regardless of whether actual losses are incurred, and that in order to soundly protect the assets of the hospital, it is necessary to protect against a possible catastrophic loss as a result of a malpractice injury. The Provider Reimbursement Manual recognizes that a hospital has a duty to utilize insurance programs to assure its financial security. Even assuming that Medicare patients receive significantly smaller awards than non-Medicare patients, the Secretary, in only reimbursing based on a ratio of actual losses, is forgetting the

reasoning behind insurance. If the Secretary were allowed to single out this type of insurance, why could she not, after a study, determine that she will pay for actual fire loss, since Medicare patients lose less in a fire than other patients. The point behind this analogy is that the Secretary is ignoring the reasons why a hospital insures itself. In further support of this view is the fact that the Secretary rejected the option of hospitals separately insuring their Medicare patients, and being reimbursed for those premiums. The Secretary found a cost among all of the "g and a" costs that she was arguably disproportionately paying for, and she did not want to lose this windfall by recognizing the traditional role of insurance. The Secretary has, therefore, failed to pay for a reasonable indirect cost of a hospital.

The Secretary focuses on the statutory language, which prohibits reimbursement if the cost is not a necessary one in the efficient rendering of services. It is difficult to understand how malpractice insurance is not a reasonable cost in the efficient rendering of service. There may be serious problems with the entire burgeoning malpractice area, but it would be imprudent for a hospital not to insure itself. Again, if the Secretary can single out this cost as unnecessary, there does not seem to be a rational stopping point for her determinations.

The Secretary must also ensure that non-Medicare patients are not paying for costs attributable to Medicare patients. By focusing in on actual loses, the Secretary is assuring that it will reimburse for actual loses as a result of Medicare patients' malpractice claims, but again it is ignoring the fact that the actual claims paid are only one factor in an insurance premium. The Secretary is ignoring the malpractice risk that is a substantial factor in determining premiums. Under the malpractice rule, depending on the hospital's Medicare/non-Medicare claims, the hospital will be reimbursed with no regard to its premium costs or the percentage risk created by the number of Medicare patients it served.

Plaintiff's weakest attack under the Medicare Act is that the Secretary did not consider other national organizations' practice in this area. The Secretary is only required to consider the other practices, and it is obvious that the Secretary was aware of the normal insurance practices, and in spite of this knowledge decided to adopt another plan. In light of our limited review, we could not overturn the regulation on this ground.

 Assuming for the moment that the regulation is within the Secretary's statutory power, we next must examine whether the Secretary's decision was an abuse of discretion. Due deference should be given to an agency's determination of how to best achieve the statutory policies that Congress directs it to implement, but such deference "cannot be allowed to slip into judicial inertia." *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). In addition, the basis for an agency's action must be sustained by an explanation contemporaneous to the rulemaking process. *FPC v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); *PPG Industries v. Costle*, 630 F.2d 462, 466 (6th Cir.1980).

In the present case, the Secretary's deviation from the traditional utilization rate for "g and a" costs was based on a Westat study which showed that malpractice awards were significantly lower in amount than losses for other patient populations. 44 Fed.Reg. 31641. The Secretary contended that this study supported her conclusion that the rule is necessary, because "the use of overall Medicare utilization to allocate malpractice costs results in Medicare's paying a disproportionate amount of malpractice costs." *Id.*

 We must, therefore, examine the Westat report as a basis for the Secretary's decision. There are some serious problems with the statistical basis of the study. The study involved nine private insurance companies, and the claims they closed within a *four*-month period in 1976. The Secretary notes that the study covered 84% of all claims closed by private carriers. The data, however, only covered a four-month

period. Some of the more serious problems with the report are as follows: hospitals (the challenged rule only applies to hospitals) only constituted 32% of the insureds, and the study does not isolate malpractice claims against the hospitals; the conclusions were based on 166 Medicare claims and the Medicare status of one-third of the claims could not be identified by the authors; and last, the study is completely silent as to the issue of whether Medicare is paying a disproportionate amount of malpractice insurance premiums. There is nothing in the study that deals with the connection between premium rates and paid claims. The Secretary has arbitrarily singled out paid claims as its basis for reimbursement, and ignored the issue of how significant a factor in premium formulation is actual losses. Plaintiff, through an affidavit of an insurance rate-setter has shown that the actual malpractice risks at a particular hospital are only the second factor in formulating rates; that the insurance company first establishes the state-wide hospital malpractice rate when establishing premiums. There are serious weaknesses with the Westat study, and it is virtually impossible to understand how a general study aimed at the malpractice problem can be the basis for a drastic change in the method of reimbursing hospitals.

In addition, the Secretary gleaned her 5.1% national ratio from the Westat study. If a hospital has no malpractice losses, it will be reimbursed for its malpractice losses based on the national ratio of 5.1%. This percentage figure was derived from the amount of awards given to Medicare patients vis-a-vis non-Medicare patients. This figure is being utilized by the Secretary despite the fact that only 166 Medicare claim awards were reviewed by the study.

Plaintiff has levied some substantial criticisms at the basis for the Secretary's findings, and the Secretary has not really responded to these criticisms. Defendant, in essence, argues that she is allowed a large margin of error because of the difficulty of establishing uncontroverted evidence, relying upon *Ethyl Corporation v. Environmental Protection Agency*, 541 F.2d 1, 37

(D.D.Cir.1976). In *Ethyl*, the court noted that the administrator need not produce a single dispositive test. The problem with relying on this language is that in the *Ethyl* case there was a voluminous amount of information, and the administrator drew his conclusions from the cumulative results of scientific evidence. In our case, we have a weak study, with an extremely limited, incomplete statistical pool that at the most supports the conclusion that awards to Medicare patients are smaller than awards to non-Medicare patients. But the study does not address the issue of whether it is significantly less expensive to insure Medicare patients for malpractice loss. The Secretary may well have broad discretion in promulgating regulations, but it is extremely difficult to comprehend how the Westat study is support for the novel conclusion that malpractice insurance premiums should be ignored, and that compensation will depend on actual loss experience.

Further weaknesses in the rule can be seen by examining hypothetical results. First, a hospital without any malpractice losses will only be reimbursed for 5.1% of its malpractice insurance costs. A hospital with only 3% Medicare patients will be reimbursed this figure as will a hospital with 97% Medicare patients, if neither has any malpractice losses. This national ratio completely ignores the risk element of insurance. A hospital with only a 5% Medicare utilization could be reimbursed for 100% of its insurance costs if its malpractice losses are only attributable to Medicare patients. Whereas, a hospital with 85% utilization could be reimbursed for none of its costs if its only claims are non-Medicare ones. The Secretary argues that these are merely extremes that do not undermine her policy decision. These examples, however, show that it is merely fortuitous whether a hospital is properly reimbursed for its malpractice insurance costs. The Secretary has no evidence to support even an inference that malpractice insurance is not a reasonable cost in the efficient rendering of health services, and thus her conclusions must be deemed arbitrary.

The Secretary cannot be bound by her internal memorandums, but it is interesting

to note that one of her officers, the Director of Reimbursement Policy for the Medicare Bureau, wrote a memorandum concerning the issue of discrete costing other "g and a" costs. The study, based on one hospital's actual experience, supported the conclusion that the Secretary was already inadequately paying "g and a" costs. In fact, the Health Care Financing Administrator noted that all the savings from the malpractice rule would be lost, if Medicare reimbursed all costs on a discrete unit basis. When one compares the almost inapplicable Westat study to the internal evidence of the agency, it is even more difficult to support the Secretary's regulation. The Secretary in her brief notes that there is not sufficient data concerning other "g and a" costs to determine whether discrete costing is appropriate. Besides the fact that there is at least one study, it is difficult to understand how the Secretary without the benefit of such data could conclude that malpractice costs were not being balanced by other "g and a" costs.

Another factor undermining the Secretary's regulation, is that many of the hospitals do not have the necessary data to utilize the rule. At least one hospital was unable to identify the financial status of its malpractice claimants, and thus received no reimbursement from Medicare. The Secretary should have been alerted to this problem, since one-third of the claims reviewed by Westat did not state whether a paid claim was a Medicare or non-Medicare patient.

We find that even if the Secretary's action did not violate the statutory language of 42 U.S.C. § 1395x(v)(1)(A), her action is, nevertheless, arbitrary and capricious. The Secretary may have been entirely correct when she determined that there was a reimbursement problem, but the Westat study does not support the conclusion that the utilization reimbursement rate should be ignored or that overall the "g and a" costs were being skewed by the lower awards to Medicare patients. There is no support in the record for the conclusion that actual losses instead of insurance costs should be the starting point of analysis. We conclude that the Secretary's regulation is arbitrary and capricious, and on these grounds must be deemed invalid.

We need not address the issue of whether the malpractice regulation is invalid under the notice and comment procedures of the Administrative Procedure Act (APA). 5 U.S.C. § 553. Plaintiff turns to the recent Supreme Court decision wherein the Court noted that: "An agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Manufacturers Assoc. v. State Farm Mutual,* — U.S. ——, ——, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443, 51 U.S.L.W. 4953, 4956 (June 26, 1983). We have already found that the regulation is invalid on substantive grounds, and thus a finding of invalidity on procedural grounds is superfluous. Despite the recent Supreme Court decision, it would be difficult for us to conclude that the Secretary has violated the procedural aspects of the APA. Defendant did issue a proposed rule and provided for 45 days for public comment. Interested parties were given time to respond, and indeed did respond in an overwhelming manner. The Secretary also provided a concise general statement of the basis and purpose of the rule, and she replied to the comments that she believed were significant. We conclude that the adequacy of the Secretary's judgment is best attacked on substantive grounds rather than procedural ones.

In summary, we conclude that the malpractice regulation is invalid. The Westat study does not support the Secretary's conclusions, and is an inadequate basis for the drastic departure from the utilization rate of reimbursement. One chapter of the report does show that malpractice awards are disproportionate, but this conclusion is based on only 166 Medicare claims, a four-month period, and a small percentage of claims paid by hospitals. More important, there is no attempt to show that the disproportionate awards justify a departure from the aggregating of "g and a" costs and a reimbursement on utilization rates. There is also no evidence to support the conclu-

sion that the mandates of insurance which require that actual losses be only one factor in reaching a premium figure are misguided.

We conclude that the Secretary has acted beyond her statutory authority in that the regulation fails to reimburse for reasonable costs both direct and indirect, and also does not assure that Medicare costs are not shifted to non-Medicare patients. For similar reasons, we determine that the rule is arbitrary and capricious. Besides the lack of record to support the action, the unusual results that could occur support the conclusion that the regulation was not really attempting to realistically handle malpractice insurance costs in a fair manner. The regulation is, therefore, deemed invalid as in violation of the Medicare Act and the standard for judicial review under the APA, 5 U.S.C. § 706(2). Accordingly, the plaintiff's motion for summary judgment will be granted.

IT IS SO ORDERED.