ALBANY GENERAL HOSPITAL, Ashland Community Hospital, Bay Area Hospital, Douglas Community Hospital, Eastmoreland General Hospital, Forest Glen Hospital, Good Samaritan Hospital, Grand Ronde Hospital, Holladay Park Hospital, Lebanon Community Hospital, Merle West Medical Center, Newberg Community Hospital, Providence Hospital, Rogue Valley Memorial Hospital, Sacred Heart General Hospital, St. Vincent Hospital, Salem Hospitals, The Dalles General Hospital, Western Lane Hospital, Plaintiffs,

v.

Margaret HECKLER, Secretary of the Department of Health and Human Services, Defendant.

Civ. No. 83–851–FR.

United States District Court,
D. Oregon.

March 2, 1984.

Thomas E. McDermott, Thomas A. Balmer, Lindsay, Hart, Neil & Weigler, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civil Div., Portland, Or., Jeanne Schulte Scott, Washington, D.C., for defendant.

OPINION AND ORDER

FRYE, Judge:

Plaintiffs, various community hospitals throughout the State of Oregon, seek a declaration by way of a motion for summary judgment that the "Malpractice Rule,"

42 C.F.R. 405.452(b)(1)(ii) is invalid on the following grounds:

a) it was promulgated in violation of the Administrative Procedure Act (APA) 5 U.S.C. § 553; and

b) it is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of 5 U.S.C. § 706; and

c) it is contrary to the substantive provisions of the Medicare Act, 42 U.S.C. § 1395f.

Plaintiffs also seek reimbursement for malpractice premiums heretofore paid on the basis of the reimbursement regulations as they existed prior to the adoption of the "Malpractice Rule."

■ Defendant, Secretary of Health and Human Services, has filed a cross-motion for summary judgment and a motion to dismiss.[1] The parties agree that the facts are undisputed and that the case is ready for disposition.

Eight federal district courts have already ruled on this matter. Four courts have invalidated the regulation. *See Mt. Carmel Mercy Hospital v. Heckler*, 581 F.Supp. 1311 (E.D.Mich.1983); *Abington Memorial Hospital v. Heckler*, 576 F.Supp. 1081 (E.D.Pa.1983); *Chelsea Community Hospital v. Heckler*, No. 83CV–6126–AA (E.D.Mich. Dec. 20, 1983); *St. James Hospital v. Heckler*, 579 F.Supp. 757 (N.D.Ill. 1984). Four courts have upheld the regulation. *See Athens Community Hospital v. Heckler*, 565 F.Supp. 695 (E.D.Tenn.1983), *appeal docketed*, No. 83–5546 (6th Cir. Aug. 5, 1983); *Cumberland Medical Center v. Heckler*, 578 F.Supp. 39 (M.D.

Tenn.1983), *appeal docketed*, No. 83–5549 (6th Cir. Aug. 9, 1983); *Humana of Aurora, Inc. v. Heckler*, No. 83–7–70 (D.Colo. Sept. 19, 1983), *appeal docketed*, No. 83–2417 (10th Cir. Nov. 4, 1983); *Walter O. Boswell Memorial Hospital v. Heckler*, 573 F.Supp. 884 (D.D.C.1983), *appeal docketed*, No. 83–2223 (D.C.Cir. Dec. 2, 1983). Five substantive opinions have been written. Judges Fullam, DeMascio, and Will have written opinions which declare the "Malpractice Rule" invalid and contrary to law. Judges Taylor and Bryant have written opinions which declare the Rule valid and pursuant to law.[2] These judges have described the basic facts concerning the dispute between health care providers and the Secretary regarding this Rule. However, in order that this court's ruling may be understood, the court will set out the undisputed facts underlying this action.[3]

### UNDISPUTED FACTS

This lawsuit arises under title XVIII of the Social Security Act (the Act), commonly known as the "Medicare" program, P.L. 89–97, codified at 42 U.S.C. §§ 1395 *et seq.* This legislation, enacted in 1965, provides for federal reimbursement for medical care for the aged. It consists of two basic components. However, only Part A, which provides hospital benefits to the elderly, 42 U.S.C. §§ 1395c—1395i–2, is at issue here.

The hospital benefits provided under Part A are funded out of Social Security taxes, 42 U.S.C. § 1395i. Hospitals are reimbursed by the government for their

---

**1.** Defendant contends that plaintiffs' claims were not timely filed. However, the certification letter sent to them from the Provider Reimbursement Review Board (PRRB) advised them that they had "60 days from the receipt of this letter to institute the appropriate action for judicial review." This suit for judicial review was instituted within 60 days of the receipt of that letter. Apparently the defendant and the PRRB have interpreted the applicable Code provisions and regulations differently. The plaintiffs complied with the rule as interpreted by the PRRB. The defendant cannot now claim that the plaintiffs should have complied with the Code provisions and regulations as she interprets them.

Defendant's Motion to Dismiss plaintiffs' complaint shall be denied.

**2.** In *Chelsea*, Judge Joiner adopted Judge De-Mascio's opinion in *Mt. Carmel*. Similarly, in *Cumberland*, Judge Morton followed Judge Taylor's opinion in *Athens*. Judge Weinshienk's opinion in *Humana* was delivered from the bench and no written opinion was issued.

**3.** The undisputed facts are set out in defendant's memorandum in support of her motion for summary judgment.

reasonable and necessary costs in providing covered services to Medicare beneficiaries or, if lower, for the customary charges for such services.

Prior to the issuance of the "Malpractice Rule," which is the focus of the dispute here, Medicare reimbursed hospitals for the cost of malpractice insurance based upon the ratio of Medicare patient utilization of the hospital's services to total patient utilization. Under this "utilization" method of apportionment, which is the basic standard for most Medicare reimbursement, all of a hospital's "allowable" costs are assigned to particular cost centers, of which there are two types: (a) revenue-producing, and (b) non-revenue-producing. Non-revenue-producing cost centers supply services for which patients are not billed. These costs are frequently referred to as overhead costs. Housekeeping and dietary services are examples of non-revenue-producing cost centers. By contrast, a patient is specifically billed for services furnished by a revenue-producing cost center. The radiology department, operating room, and laboratory are examples of revenue-producing cost centers. The costs in non-revenue-producing cost centers, including those accumulated in the General and Administrative (G & A) cost center, are then allocated to the revenue-producing cost centers. Once allocated to a revenue-producing cost center, the total costs in each center are then apportioned to determine the proportion of costs that Medicare beneficiaries must pay, based upon the percentage of total services in that cost center utilized by Medicare patients. As the court noted above, this is the method used to determine the cost of malpractice insurance attributable to Medicare patients and for which the hospitals were reimbursed by the Secretary prior to the adoption of the "Malpractice Rule."

Alarmed by increases in the cost of hospital malpractice insurance premiums, the Medicare Bureau began in 1975 to review the issue of malpractice insurance costs. The Medicare Bureau concluded that Medicare's share of a hospital's cost of malpractice insurance was extremely high in comparison with the amount of malpractice awards actually paid on claims filed by Medicare patients.

In 1976 the then department of Health, Education and Welfare (HEW) examined statistics cited in the Report of the Secretary's Commission on Medical Malpractice, a comprehensive study conducted in 1973, which indicated that when malpractice claims were categorized by source of health care coverage, only 12.9% of these claims originated with patients eligible for Medicare or Medicaid benefits. The Report also showed that because Medicare and Medicaid patients were older, often disabled, and of lower economic status, with minimal loss of income, the amounts paid to them as damages for hospital malpractice were less than the amounts paid to other patients. The Medicare Bureau again concluded that it was paying a significantly disproportionate share of the costs of hospital malpractice insurance, because hospitals were exposed to an extremely low level of potential malpractice loss from Medicare beneficiaries in comparison to that occasioned by the treatment of other patients.

Based upon this evidence, HEW asked that an already contracted study of the malpractice insurance problem be expanded to include a survey of medical malpractice claims closed during 1976. The study was conducted by an independent contractor, Westat, Inc. This study included data as to source of payment for the medical and hospital services giving rise to closed malpractice claims, i.e., Medicare, Medicaid, Blue Cross, commercial insurance, etc., and the amount of actual hospital malpractice loss payment in each category.

In January, 1978, the Administrator of the Health Care Financing Administration (HCFA), the component of the Department which administers the Medicare program, sent a memorandum to the Undersecretary of HEW accompanied by an option paper that suggested a number of specific proposals for changes in Medicare reimbursement. Included among these proposals

was one that was substantially similar to the current "Malpractice Rule."

In the early part of 1978, the Department received a copy of the report from Westat. This study showed that during the period covered by the report, Medicare patients were responsible for only 5.1% of the total malpractice awards. The results of this study were interpreted by HEW to mean that Medicare was paying a substantially disproportionate share of the costs of hospital malpractice insurance.

Concurrently, a HEW task force was established to develop options for addressing the various problems created by the nationwide malpractice insurance crisis. Based upon the Westat Report and the earlier Report of the Secretary's Commission, the Task Force concluded that the Medicare and Medicaid programs were paying an excessively large share of the cost of malpractice insurance. The Task Force report stated that:

> [T]he federal government picks up a disproportionate share of (malpractice insurance costs): Medicare utilizes approximately 33% of all inpatient hospital services and Medicaid approximately 15%. These two programs thus pay approximately 48% of hospital malpractice premium costs, which are passed on through the reimbursement system. However, a recent closed claim study suggests that Medicare and Medicaid account for a much lower percentage of the total dollars paid in malpractice claims (probably between 10 and 20%). If the study accurately reflects the general situation, federal programs are subsidizing private payers for a significant percentage of malpractice-related costs.

(Task Force Report, "Issue 5: To address the problems surrounding medical malpractice and insurance rates," pp 3–4.) To correct the situation, the report went on to present several options for Secretarial action. One of these options evolved into what is now referred to as the "Malpractice Rule."

On March 5, 1979, the Administrator of the HCFA forwarded a recommendation that the Secretary approve publication of a notice of proposed rulemaking (NPRM) establishing the Malpractice Rule. This NPRM was published on March 15, 1979, and called for a 45-day public comment period. 44 *Fed.Reg.* 25476. Finally, on June 1, 1979, the Department published the "Malpractice Rule" in what is now its final form. 44 *Fed.Reg.* 31641.

## ANALYSIS AND RULING

In reaching its decision the court declines to address the procedural issues involved in issuing the "Malpractice Rule" or to determine whether the "Malpractice Rule" is arbitrary or capricious. This court will address the "Malpractice Rule" only as it relates to the substantive provisions of the Medicare Act, 42 U.S.C. § 1395f.

■ The Medicare Act requires that hospitals be reimbursed for "reasonable costs or customary charges," whichever is less. 42 U.S.C. § 1395f(b). "Reasonable costs" is the standard involved in this case. The Act's definition of "reasonable costs" is lengthy, but leaves to the Secretary considerable discretion to adopt regulations specifying methods for determining reasonable costs. However, the statute specifically states that "[t]he reasonable cost of any services shall be *the cost actually incurred*, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (emphasis added).

The Act also requires that reimbursement standards "take into account *both* direct and indirect costs ... in order that ... the necessary costs of efficiently delivering covered services to [Medicare patients] will not be borne by [non-Medicare patients]." *Id.*

■ In order to determine whether the "Malpractice Rule" furthers these mandates of the Medicare Act the court must examine how the "Malpractice Rule" operates in practice. In practice this is what happens:

If 99% of a hospital's patients are Medicare patients and if the hospital has paid one malpractice claim over the past five years, and that claim was paid to a Medicare beneficiary, 100% of that hospital's malpractice costs will be reimbursed by Medicare. On the other hand, if that one claim was paid to a non-Medicare patient, Medicare will not reimburse any of the hospital's malpractice costs, despite the fact that 99 percent of the patients at that hospital are Medicare patients. If no malpractice claims have been paid during the five-year period, the hospital will be reimbursed for 5.1% of its cost of providing hospital malpractice insurance, regardless of the percent of its patients which are Medicare patients and regardless of the fact that these Medicare patients have been covered by hospital malpractice insurance during all of their stay in the hospital. (*See* similar examples in *Abington Memorial Hospital,* at 1088, and *Mt. Carmel Mercy Hospital,* at 1317.)

Under the "Malpractice Rule" it is clear that whether a hospital is reimbursed for the "reasonable cost" of providing hospital malpractice insurance protection for its Medicare patients is merely fortuitous. *See Mt. Carmel Mercy Hospital,* at 1317. The "Malpractice Rule" does not comport with the substantive provisions of the Medicare Act.

IT IS ORDERED that plaintiffs' motion for summary judgment is GRANTED. Defendant's motion for summary judgment is DENIED.