**EAST JEFFERSON GENERAL HOSPITAL, et al.**

v.

**Margaret M. HECKLER, et al.**

Civ. A. No. 83–4107.

United States District Court, E.D. Louisiana.

Oct. 19, 1984.

Steven Witman, Johnston & Duplass, New Orleans, La., and Ronald N. Sutter, Powers, Pyles, Sutter & O'Hare, Washington, D.C., for plaintiffs.

Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., and Jeanne Schulte Scott, Office of General Counsel, Dept. of Health & Human Services, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ROBERT F. COLLINS, District Judge.

Plaintiffs in this action are a group of hospitals who are "providers of services" to Medicare patients, as defined in 42 U.S.C. § 1395x(u). They challenge the validity of the "Malpractice Rule," 42 C.F.R. § 405.452(b)(1)(ii), a recently adopted regulation which changes the formula by which provider hospitals are reimbursed for medical malpractice premiums by Medicaid and Medicare. The defendant, Margaret M. Heckler, Secretary of the Department of Health and Human Services, is the administrator of the Medicare program. The plaintiffs invoke the Court's jurisdiction pursuant to 42 U.S.C. § 1395oo (f)(1).

The matter is before the Court on the parties' cross motions for summary judgment. Also before the Court is defendant's motion to strike Plaintiffs' Exhibit 23. After oral argument on the matter, the Court took the matter under advisement.

In summary, the Court's ruling of the pending motions are as follows:

(1) the motion to strike plaintiffs' Exhibit 23 is GRANTED;[1]

(2) the defendant's motion for summary judgment will be DENIED;

(3) the plaintiffs' motion for summary judgment will be GRANTED; and

(4) the matter is remanded to the Secretary of the Department of Health and Human Services for further consideration in accordance with this Opinion.

### Introduction

This suit challenges the procedural and substantive validity of a Medicare regulation, 42 C.F.R. § 405.432(b)(1)(ii), commonly known as the Malpractice Rule, governing the apportionment of a hospital's malpractice insurance costs to the Medicare program. Plaintiffs argue that the Malpractice rule is invalid because: (1) it is arbitrary and capricious; (2) it violates the Medicare Act; and (3) it was not promulgated in accordance with the mandatory notice and comment procedures of the administrative procedure act.

### Background

On March 15, 1979, the Secretary of the Department of Health and Human Services[2] (Secretary) announced an anticipated change in Medicare reimbursement policy through a notice of proposed rulemaking. 44 Fed.Reg. 15744. The final regulation, published on June 1, 1979, effective on June 30, 1979, dramatically changed the method of calculating reimbursement[3] for malpractice insurance costs (or self-insurance fund contributions) incurred by qualified providers servicing Medicare patients. Prior to adoption of this regulation, providers pooled medical malpractice insurance

---

1. This exhibit consists of an affidavit and appendices which are not part of the rulemaking record. It is well settled that agencies cannot use affidavits as post hoc rationalizations to justify their actions. *Citizens v. Preserve Overton Park and Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). The Court does not believe that a plaintiff should be able to attack an administrative action by affidavit either, as the question before the Court in reviewing a rule promulgated by an agency remains whether or not the rule was properly promulgated and is supported by the record as a whole. *Overton Park, supra; Camp v. Pitts*, 411 U.S. 138, 140–142, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973).

 Accordingly, the Court will GRANT defendant's motion to strike Exhibit 23. The Court will disregard those portions of the plaintiffs' argument which rely on the stricken Exhibit.

2. The Department of Health, Education and Welfare was replaced by the Department of Health and Human Services On May 4, 1980, pursuant to section 509(a) of the Department of Education Organization Act, Pub.L. 96–88, 93 Stat. 668, 42 F.R. 29642.

3. Payment to qualified providers under Medicare is made either directly or through fiscal intermediaries pursuant to contract with the Secretary. 42 U.S.C. § 1395h. At the close of its fiscal year, a provider submits a "cost report" which apportions costs between Medicare and non-Medicare patients. 42 C.F.R. § 405.406(b) and § 405.453(f). The intermediary conducts an audit and issues a determination of program reimbursement. An appeal from this determination may be taken to the Provider Reimbursement Review Board (PRRB or Board). 42 U.S.C. § 1395oo. The Board is bound by the Secretary's reimbursement regulations in determining such appeals. 42 U.S.C. § 405.1867.

costs with other indirect administrative and general (A & G) costs. Reimbursement from Medicare funds for A & G costs was based on the percentage of services utilized by Medicare patients (a Medicare utilization rate). That is, if Medicare patients utilized 50% of a provider's services, Medicare would reimburse that provider for 50% of its A & G costs, including 50% of its medical malpractice insurance premiums. The Medicare utilization rates for plaintiffs in this case range from approximately 44% to 57.4% for the cost years at issue here.[4]

The challenged regulation takes medical malpractice insurance premiums out of the A & G category and directly apportions them between Medicare and non-Medicare patients as follows:

> For cost reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice losses for the current cost reporting period and the preceding 4-year period. If a provider has no malpractice loss experience for the 5-year period, the costs of malpractice insurance premiums or self-insurance fund contributions must be apportioned to Medicare based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The Health Care financing Administration will calcu-

late this ratio periodically based on the most recent departmental closed claim study. If a provider pays allowable insured malpractice losses incurred by Medicare beneficiaries, either through allowable deductible or coinsurance provisions, or as a result of an award in excess of reasonable coverage limits, or as a governmental provider, such losses and related direct costs must be directly assigned to Medicare for reimbursement.[5]

Plaintiffs are nine not-for-profit Louisiana hospitals which furnish services to Medicare patients. Prior to the promulgation of the Malpractice Rule, they were reimbursed for malpractice insurance rates under the traditional utilization approach.

As a result of the Malpractice Rule, for the years ending 1980–1981, plaintiffs were reimbursed according to the regulations direct apportionment method rather than on the basis of Medicare utilization. Eight of the plaintiffs were reimbursed 5.1% of their malpractice insurance costs in accordance with the "national ratio" applicable to hospitals with no paid claims for the relevant five year period.[6] One of the hospitals (Glenwood Regional Medical Center) received no Medicare reimbursement for its malpractice insurance costs because during the five year period, it had paid a non-Medicare claim but had not paid a Medicare claim. Because plaintiffs' Medicare utilization rates range from 33% to 57.4%, defendants' application of the Malpractice Rule

---

**4.** The 1980 and 1981 cost reporting years are before the Court. The Social Security Amendments of 1983 (Pub.L. No. 98–21) enacted a new prospective payment reimbursement system applicable for cost reporting years beginning on or after October 1, 1983, but that system has no bearing on the resolution of the issues before the Court.

**5.** 42 C.F.R. § 405.452(b)(1)(ii). For example, three similarly situated hospitals with malpractice insurance premiums of $100,000 and a Medicare patient utilization rate of 40% would receive reimbursement, as follows:

> Hospital A with one claim paid to a Medicare patient will receive 100% reimbursement or

$100,000; Hospital B with one claim paid to a non-Medicare patient will receive 0% or no reimbursement; Hospital C with no malpractice claims paid out will receive 5.1% or $5,100 reimbursement.

Under the Medicare utilization method of reimbursement, each hospital would receive $40,000 from Medicare toward their medical malpractice premium.

**6.** The eight hospitals are Tulane Medical Center, Mercy Hospital, Saint Anne General Hospital, Willis-Knighton Medical Center, Lasalle General Hospital, East Jefferson General Hospital, Hood Memorial Hospital, and Opelousas Hospital.

resulted in a substantial loss in Medicare reimbursement.[7]

This action followed a hearing before the Provider Reimbursement Review Board (Board) and certification of plaintiffs' challenge to the Malpractice Rule pursuant to 42 U.S.C. § 1395*oo* (f)(1).[8] 42 U.S.C. § 1395*oo* (f) provides that the case "shall be tried pursuant to the applicable provisions under Chapter 7 of Title 5 [the Administrative Procedure Act (APA)]...." The provision of the APA governing the scope of review is 5 U.S.C. § 706, which requires an administrative decision to be set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law.

In *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983), the Supreme Court recently described the scope of review "under the arbitrary and capricious" standard as follows:

> [T]he agency must examine the relevant date and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." (Citations omitted.)

The Court has been advised that numerous other district courts have ruled on challenges to the Malpractice Rule. Although the majority of these decisions appear to have been appealed, no court of appeals has yet issued an opinion concerning the validity of the Malpractice Rule.

At least four district courts have held that the Malpractice Rule is valid. *See, Athens Community Hospital v. Heckler*, 565 F.Supp. 695 (E.D.Tenn.1983), *appeal docketed*, No. 83–5546 (6th Cir. Aug. 5, 1983); *Cumberland Medical Center v. Heckler*, 578 F.Supp. 39 (M.D.Tenn.1983) (Morton, J.) (adopting Opinion in *Athens Community Hospital v. Heckler*), *appeal docketed*, No. 83–5549 (6th Cir. Aug. 9, 1983); *Humana of Aurora, Inc. v. Heckler*, No. 83–2–70, slip op. (D.Colo. Sept. 19, 1983) (Weinshienk, J.); *appeal docketed* No. 83–2417 (10th Cir. Nov. 4, 1983); *Walter O. Boswell Memorial Hospital v. Heckler*, 573 F.Supp. 884 (D.D.C.1983), *appeal docketed*, No. 83–2223 (D.C.Cir. Dec. 2, 1983), (argued June 4, 1984).

At least ten courts have held the regulation to be invalid. *See, Mt. Carmel Mercy Hospital v. Heckler*, 581 F.Supp. 1311 (E.D.Mich.1983) (DeMascio, Jr.), *appeal docketed*, No. 84–1188 (Mar. 21, 1984); *Abington Memorial Hospital v. Heckler*, 576 F.Supp. 1081 (E.D.Pa.1983) (Fullam, J.), *appeal docketed*, No. 84–1079 (Feb. 15, 1984); *Chelsea Community Hospital v. Heckler*, No. 83CV–6126–AA, slip op. (E.D.Mich. Dec. 29, 1983) (Joiner, J.) (adopting Opinion of DeMascio, J. in *Mt. Carmel Mercy Hospital v. Heckler*), *appeal docketed*, No. 84–1146 (6th Cir. Mar. 6, 1984); *St. James*

---

**7.** Plaintiffs' Exhibit 6 sets forth each hospital's Medicare utilization rate an approximate amount in controversy for each cost reporting year at issue.

**8.** There is no jurisdictional problem in the present case because plaintiffs have satisfied all

the requirements of 42 U.S.C. § 1395*oo* (f), upon which jurisdiction is predicated. Satisfaction of those requirements, however, requires the passage of a considerable period of time, which explains why this suit was not brought until four years after the Rule was promulgated.

*Hospital v. Heckler,* 579 F.Supp. 757 (N.D. Ill.1984) (Will, J.), *appeal docketed,* No. 84–1478 (7th Cir. Mar. 27, 1984); *Lloyd Noland Hospital and Clinic v. Heckler,* No. CV83–PT–0868–S, slip op. (N.D.Ala. Apr. 5, 1984) (Propst, J.); *Bedford County Memorial Hospital v. Heckler,* 583 F.Supp. 367 (W.D.Va.1984) (Turk, J.); *Albany General Hospital v. Heckler,* 584 F.Supp. 614 (D.Oregon 1984) (Frye, J.), *appeal docketed,* No. 84–3865 (9th Cir. June 6, 1984); *Humana of Illinois, Inc. v. Heckler,* 584 F.Supp. 618 (C.D.Ill.1984) (Alderman, J.) (adopting Opinion of Will, J. in *St. James Hospital v. Heckler*), *appeal docketed,* No. 894–1727 (7th Cir. Apr. 30, 2984); *St. Joseph's Hospital, Tucson v. Heckler,* 583 F.Supp. 1545 (D.Ariz.1984) (Marquez, J.); *Alexandria Hospital v. Heckler,* 586 F.Supp. 581 (E.D.Va.1984) (Merhige, J.).

This Court must agree with the majority of other courts which have addressed this problem that the Malpractice Rule is invalid. However, inasmuch as judicial authority on this matter is split, this Court finds it necessary to state its reasons for invalidating the regulation.

*Discussion*

The substance of plaintiffs' complaint involves three challenges to the regulation. First, they maintain that the Secretary's action in promulgating the regulation has no rational basis and is, therefore, arbitrary and capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A). Second, they argue that the regulation violates the Medicare statute, 42 U.S.C. § 1395x(v)(1)(A) because, among other things, it fails to reimburse providers for reasonable costs [9] of necessary services as required; it shifts the burden of "Medicare-related" actual costs to non-Medicare patients; and it fails to reimburse indirect costs as provided by the Medicare Act. Finally, plaintiffs' claim that the regulation is procedurally defective because it was promulgated in violation of the rule making requirements of the APA, 5 U.S.C. § 553.

The first and second challenges involve substantive issues. The Court will address each of these claims separately.

*Violation of the APA*

Plaintiffs claim the Secretary violates the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2)(A) by offering an explanation for the regulation based on inadequate evidence (the Westat Study) and by failing to consider all relevant data pertinent to the malpractice problem. The Secretary argues that the Westat Study merely confirms conclusions already deduced by the agency from a full study of the malpractice problem conducted over a four year period beginning in 1973, *see* Defendants' Brief 9, but not made a part of the administrative record. Moreover, the Secretary takes the position that the Westat Study supports the Malpractice Rule and is a reliable basis for the Secretary's action.

 The applicable standard of review, § 706(2)(A) of the APA, provides:

> that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law.... *Camp v. Pitts,* 411 U.S. 138 at 142 [93 S.Ct. 1241 at 1244, 36 L.Ed.2d 106] (1973).

This standard is a highly deferential one. It presumes agency action to be valid. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is not to say, however, that the Court must rubber-stamp the agency decision as correct. To do so would render the review process superfluous. *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.1976). Therefore, the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens*

---

**9.** "Reasonable cost" is defined in the statute as the "cost actually incurred excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Congress directed the Secretary of HHS to further define "reasonable cost" by issuing reimbursement regulations.

*to Preserve Overton Park, supra.* Although the Court is not permitted to substitute its judgment for that of the agency, it must make a substantial inquiry into the facts to insure that the agency demonstrates a rational connection between the facts found and the choice made. *Id., See also, United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519 (D.C. Cir.1978). Furthermore, the validity of the agency's action must be sustainable on the administrative record made. *Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244 and *Almay, Inc. v. Califano,* 569 F.2d 674, 681 (1977) (where the court held that since informal rulemaking procedures are much more susceptible to abuse, it becomes all the more important that a rational basis for the agency's decision be found in the facts of the record). With this limited scope of review in mind, the Court has searched the rulemaking record and can find no rational basis for the regulation.

The Westat Study [10] indicated that Medicare patients represented approximately 12% of the study's 2,637 malpractice claims where source of payment (Medicare, Medicaid or self-payment) was identified. In addition, the study indicated that of $35,680,-971 in identified malpractice awards, 5.1% or $1,820,303 represented awards to Medicare patients. Westat Report at 5–9. Further evidence "showed" that in years prior to 1978, Medicare beneficiaries utilized at least 30% of all inpatient hospital services. Record, Vol. 1, tab 7 at 3. From these figures, the Secretary determined that under the utilization method of apportioning costs, Medicare was reimbursing costs at more than six times its portion of total malpractice losses against which such insurance was purchased. This, the Secretary maintains, justified her action in formulating the rule, and "conclusively" established what she already knew from her previous study of the malpractice problem. The administrative record reveals, however, that the agency never mentioned any study other than the Westat Study in its Notice of Proposed Rulemaking or in the Basis and Purpose Statement. There is no copy or analysis of the "full study" referred to in the Secretary's memorandum in the rulemaking record. The agency never identified at any time prior to the issuance of the regulation any other source as playing a part in its thinking, consideration, or decision to issue the challenged regulation. Consequently, since the regulation must be sustained on the administrative record alone, a rational basis for the regulation must be found in the Westat Study. For the reasons cited in *St. James Hospital v. Heckler, supra,* the Court believes that the Westat Study is an inadequate foundation upon which to build the conclusion that there was a rational connection between the facts found and the choice made.

In *St. James,* Judge Will focused on the warnings found in the Westat Study itself: the authors of the Westat Study cautioned against extrapolation of wide-ranging conclusions and noted that "conclusions must be drawn very cautiously because of the possibility of biased data." The authors note two potential sources of bias in the sample of claims. First, many claims had multiple defendants who were not always represented by participating companies and although reporting companies probably knew the total number of defendants "they could not provide us with specific information about their characterizations." The second potential source of bias is that some providers, especially hospitals, are self-insuring and thus their claims had "no chance of turning up in the data base." (Citations omitted.)

At 766. Judge Will went on to cite *Almay, Inc. v. Califano, supra,* at 674, 677, 682 where:

the court considered whether the FDA's reliance on a "flawed survey," about

---

**10.** The Westat Study was based on data obtained from nine private insurance carriers selected by the American Insurance Association, covering all claims closed during the period from July 1, through October 1, 1976. Insureds from these nine companies were involved in 84% of all claims closed by private carriers in 1976.

which the Director of the FIC's Bureau of Consumer Protection who sponsored and designed the study warned that the results should be used with caution, constituted a violation of the arbitrary and capricious standards of 5 U.S.C. § 706(2)(A). The court held that reliance on the survey was a "clear error of judgment." In the present case, reliance on the Westat Study is similarly an error of judgment. (Citations omitted.)

At 766. In addition to these criticisms, it should be noted that the Westat Study was not designed to analyze the frequency or size of claims comparing Medicare and non-Medicare patients or to distinguish claims against hospitals from claims against other health care providers, even though claims against physicians, dentists, and nursing homes were included in the data base.[11]

Standing alone, this fact would be sufficient to invalidate the Secretary's reliance on Westat. When considered with the author's stated limitations on the use of the study and their warnings of statistical bias in the sample, it can only be concluded that the regulation lacks a rational basis and cannot be sustained.[12]

*Violation of the Medicare Statute*

■ The Medicare statute under which the agency promulgated the rule states that a provider hospital shall be reimbursed "[t]he reasonable cost of any services [which] shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A). To be valid, therefore, the regulation must take into account both a provider's direct and indirect costs, and may not cause costs properly allocable to care of Medicare patients to be shifted to non-Medicare patients. *Id.; Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 989 (7th Cir.1982). Further, the cost regulation must be rational, non-arbitrary and must further the purposes of the Medicare statute. *Northwest* at 989. Plaintiffs contend that the regulation falls far short of this standard because it fails to reimburse provider hospitals for insurance costs reasonably incurred in treating Medicare patients, thereby shifting Medicare costs to non-Medicare patients, in violation of the Medicare Statute.

The statute affords the Secretary some discretion in prescribing regulations that determine the computation of the reasonable cost of services. But her discretion is not unlimited and certainly not beyond judi-

11. As stated in Westat, its general purposes were: to undertake an analysis of the frequency and types of claims and comparisons for economic losses.... *[T]he objective is a detailed examination of the causes of injuries that lead to claims* as well as legal systems and patient characteristics that are related to the occurrence of claims.

The purpose of the analysis of causes of injuries is to provide information that can be used to develop injury prevention programs as a policy approach to reduce the occurrence of malpractice incidents. The purposes of analysis of size awards are (1) to determine the importance of economic losses in determining award amounts and (2) to examine selected characteristics such as changes in the legal system that affect the size of awards. Plaintiffs' Exhibit 21 at 1–3 (emphasis supplied).

The study specifically stated that "it is not the explicit purpose of this study to make national yearly estimates." *Id.*

12. The Secretary cites the following language from *Ethyl Corp. v. EPA, supra,* at 37–38 for the proposition that she need not disregard the Westat data merely because of the possible uncertainties and margin of error in the report:

"We need not see a single dispositive study that fully supports the Administration's determination. Science does not work that way; nor, for that matter does adjudicatory fact finding."

Taken out of context, this language might support the Secretary's position. A full reading of the case, however, reveals a distinct difference from the instant case. The Administrator's decision in *Ethyl Corp.* was based on "the inconclusive but suggestive results of *numerous* studies." *Id.* (Emphasis supplied.) The *Ethyl* court explained that:

[b]y its nature, scientific evidence is cumulative: the *more* supporting, albeit inconclusive, evidence available, the more likely the accuracy of the conclusion. If one single study or bit of evidence were sufficient independently to mandate a conclusion, there would, of course, be no need for any other studies. Only, rarely, however, is such limited study significant. *Id.*

cial review. The Court would not, of course, substitute its judgment for that of the Secretary, but if her interpretation of reasonable cost does not comport with statutory requirements then it should not be upheld. The Court cannot "rubber-stamp" administrative decisions that are inconsistent with statutory mandates. *See Bureau of Alcohol, Tobacco, and Firearms v. FLRA*, 464 U.S. 89, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).

Prior to the challenged regulation, the Secretary had aggregated all A & G costs, including malpractice insurance. Plaintiff argues that there is no logical reason to separate malpractice insurance from other insurance and other A & G costs. By so doing, the Secretary ignores the fact that insurance premiums are paid regardless of whether actual losses are incurred or not, and that malpractice insurance is designed to protect, necessarily, the assets of a hospital against potential catastrophic loss. *See Mt. Carmel, supra,* at 1316–17.

Earlier in this Opinion, the Court discussed the effects of the new regulation on hospital malpractice reimbursement. These effects prompted Judge Fullam to observe that the Secretary has chosen "an allocation formula which is least likely to reflect reality ... a formula which seemingly guarantees that the statutory mandate will inevitably be violated in most cases." *Abington Memorial Hospital, supra,* at 1089. This is so because:

(1) The ratio between malpractice claims paid on account of Medicare patients and malpractice claims paid on account of non-Medicare patients over the most recent five-year period has very little, if any, relationship to the hospital's current cost of maintaining malpractice protection. (2) The "national average" (currently estimated at 5.1%) of that ratio has even less bearing on the current malpractice coverage costs of any particular hospital. (3) The data relied upon in the Westat Report, including the data which produced the 5.1% figure, included both payments made to satisfy the liability of hospitals and claims paid to satisfy the liability of physicians. There is no evidence to support the conclusion that these combined payments provide reliable information about the malpractice payment experience of hospitals. Indeed, there is reason to believe that they do not....

*Id.* at 1089.

The Court emphasizes that the Secretary is not, of course, limited to any one method of reimbursement and may use different methods for different costs and circumstances. This the statute clearly allows. 42 U.S.C. § 1395x(v)(1)(A). But when, as here, the chosen method neither assures that Medicare costs will not be borne by non-Medicare patients nor that hospitals will be reimbursed the reasonable costs of their services ("actual costs minus those found to be unnecessary in the efficient delivery of health services"), then the regulation does not carry out the mandate of the Medicare statute and is invalid.

Plaintiffs' final challenges to the Malpractice Rule involve procedural issues. Plaintiffs argue that the Malpractice Rule is procedurally invalid because (1) the Secretary violated the mandatory notice and comment procedures of the APA; and (2) the Secretary failed to respond adequately to the comments which were received. Since the Court has determined that the regulation is substantively defective, in violation of both the APA and the Malpractice Act, it need not address plaintiffs' claims that the Malpractice Act is also procedurally defective.

*Conclusion*

The medical malpractice reimbursement regulation is substantively defective and violates both the Administrative Procedure Act and the Medicare Act. Accordingly, and for the reasons outlined above, the plaintiffs' motion for summary judgment is granted. Defendant's motion for summary judgment is denied. The matter is hereby remanded to the Secretary for further consideration in accordance with this Opinion.